Filed 1/28/26  P. v. Wright CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JACQUISE CARLTON WRIGHT,<br><br>    Defendant and Appellant. | B339136<br><br>(Los Angeles County Super. Ct. No. NA116416-01) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jacquise Carlton Wright appeals from a judgment of conviction entered after a jury found him guilty of the first degree murder of Alejandra Martinez, the attempted premeditated murder of Nadia Moralez, and other offenses with respect to a shooting at a taco truck in Long Beach on December 4, 2020.

Wright contends his convictions should be reversed because the trial court abused its discretion in admitting an incriminating note recovered from Wright's confederate Tyquan Markeith Benson while Benson was in jail following the shooting because the note was not relevant to show Wright's culpability. Further, Wright argues admission of the note was unduly prejudicial under Evidence Code section 352 because the jury could have improperly relied on the note to find Wright did not act in self-defense. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Prosecution's Case*[1]

1.   *The December 4, 2020 shooting*

At around 11:00 p.m. on December 4, 2020, Victor Valdez parked in front of a taco truck in a parking lot located at the northeast corner of Magnolia Avenue (a north-south street) and

---

[1]   Wright and Benson were initially tried together before a single jury (the first trial). On the last day of the prosecution's case, the trial court granted Wright's motion for a mistrial based on the sudden unavailability of his defense attorney. The facts are taken from Wright's second trial (without Benson).

2

Anaheim Street (an east-west street) in Long Beach.[2]  The taco truck was parked in the southwest corner of the lot, and the lot had an exit to Magnolia Avenue (northwest of the truck) and an exit to Anaheim Street (south of the truck).

Valdez testified that soon after he arrived, he saw two Black men (later identified as Wright and Benson) arrive in a dark-colored sedan and park next to Valdez's car.  After a minute or two, Valdez observed the driver of the dark sedan arguing with a group of Hispanic men in front of the taco truck.  Valdez testified that after about a minute of argument, the two Black men returned to the dark sedan and began to drive away.  Valdez then heard gunshots and saw one of the two Black men shooting from the driver's side of the dark sedan.  The sedan exited the parking lot onto Magnolia Avenue.  At around the same time, a brown or gold sedan drove away.  Valdez testified at a prior proceeding that he was "not sure" whether either Black man arrived in the second car.

At around 11:00 p.m. that night, Stephanie Minuez was working as a cashier at the taco truck.  The truck had around 10 customers, all of whom were Hispanic except for two Black males.  Minuez testified she saw the two Black males arrive separately in two cars: a dark sedan and a white sedan.  The men appeared to be in their 20's, had short curly hair and tattoos, and wore chains.  The men ordered food at the taco truck, Minuez told them the wait would be 15 minutes, and the men left in the dark sedan.  Minuez recounted that the two men returned in the dark sedan about 15 or 20 minutes later.

---

[2]     Valdez's testimony and a photograph of the parking lot admitted at trial established that the front of the taco truck was facing east and Valdez parked just to the east of the truck.

After the two men returned, Minuez handed the food to one of the men, and she saw at least one of the men interact with a group of about five Hispanic people waiting in line. Minuez believed the man who picked up the food initiated the conversation by asking, "Where are you from?" Minuez heard a female in the Hispanic group answer that they belonged to the "Longo" gang. The man who picked up the food returned to the driver's seat of the dark sedan. The man then pulled out a medium, dark gray gun and fired "several" shots in the direction of the Hispanic group. Minuez dropped to the floor with her colleagues and heard the car "burn rubber," turn, and exit the parking lot onto Magnolia Avenue. About five to seven seconds later, Minuez heard more gunshots coming from behind the taco truck on Magnolia Avenue.

At trial, Minuez identified Wright as one of the two Black men at the taco truck on the night of the shooting, but she could not recall whether he was the man who picked up the food or the other man. However, Minuez had testified in an earlier proceeding that Wright was the man who picked up the food, then entered and drove the dark sedan.

Nadia Moralez[3] walked with a girlfriend to the taco truck on the night of December 4, and a few male "homies" from the East Side Longos criminal street gang followed them there. Moralez was associated with the East Side Longos gang. As she was ordering food at the taco truck, her "friends" began "banging"[4] on one of two Black men, "and [the Black man] banged

---

[3] Moralez testified at the trial, and her July 2023 interview with police detectives was played for the jury.

[4] A gang expert for the defense testified "banging is a term that's used to describe when somebody challenges somebody else"

back," asking, "'where y'all niggas from?" One of Moralez's "homies" answered, "'I'm from East Side Longo.'" The two Black men got into separate cars. The one who had been "banging" entered a brown or gold car, pulled out of his parking space, yelled "Fuck Chongos,"[5] and started shooting at Moralez from in front of the taco truck; the car then drove off. Moralez also saw a second person in a dark sedan shooting in the direction of the taco truck from Magnolia Avenue. Moralez was shot in the arm, hip, and buttocks. After she was shot, Moralez saw an older woman behind her in the line for the truck who was bleeding from her throat. Moralez did not see any of the male East Side Longos members carrying or shooting any firearms that night.

Widhny Soto and her cousin, Alejandra Martinez, were walking to pick up their order from the taco truck when Soto heard between one and three gunshots, which she believed came from the parking lot's Anaheim Street exit. Soto "felt" someone shoot once from behind the truck. Soto ducked down, and Martinez came over to her. Martinez had been shot in the right upper chest, and Soto pulled her down to the ground. Soto then heard two or three gunshots from the street. Soto had seen the group of Hispanic men before she and Martinez had ordered, but she did not see any of them carrying weapons. Martinez was transported to the hospital and later died from her chest wound.

---

about that person's gang affiliation, and that the act commonly started with the question, "Where are you from?"

[5]     Moralez confirmed "Chongos" was a disrespectful way to refer to the Longos gang.

2. *The police investigation*

City of Long Beach police officers and forensic specialists secured and processed the crime scene within hours after the shooting. A forensic specialist recovered four 9-millimeter bullet casings in the parking lot, north of the taco truck, close to the Magnolia Avenue exit. She also recovered a bullet and a copper bullet jacket to the east of the truck, close to the Anaheim Street exit. She recovered another bullet from under the taco truck, and a bullet fragment was found in front of it. Three .380 automatic cartridge cases were found at the rear of the truck closer to Magnolia Avenue. Two bullet fragments were also found near a planter behind the truck.

Homicide detectives obtained surveillance video footage from a gas station on Anaheim Street directly across from the taco truck and footage from a liquor store located two blocks east on Anaheim Street. Excerpts were played for the jury. Video footage from the gas station showed that at around 11:00 p.m. on the night of the shooting a dark sedan parked in the taco truck parking lot and two men emerged—one was wearing light-colored clothing and a hoodie, and the other was wearing darker clothing. The men walked to the taco truck, then returned to the dark sedan and drove east on Anaheim Street.

The liquor store surveillance video showed two men entering the liquor store around 11:03 p.m.[6] A Long Beach detective identified the man wearing a white branded sweater and gray sweatpants as Wright and the man wearing darker

---

[6] The time index on the liquor store video indicated this event took place at 12:20 a.m., but a homicide detective testified the liquor store's camera system was one hour, 17 minutes, and 15 seconds ahead.

6

clothing as Benson. At around 11:05 p.m. the men exited the liquor store, returned to the car, and drove off.

The gas station video footage showed that at around 11:15 p.m. the two men returned to the taco truck in separate vehicles. First, a light-colored vehicle pulled into the taco truck parking lot from the north and reversed into a parking stall; a man in darker clothing emerged. Then, a second, darker-colored vehicle pulled into the parking lot with its hazard lights flashing, and a man in a light-colored sweatshirt got out. A homicide detective identified the first man as Benson and the second as Wright. After a short time, the men returned to their respective vehicles, with Benson carrying a food bag. Wright's vehicle (the dark sedan) made a three-point turn, intermittently stopped, and pulled toward the parking lot's Magnolia Avenue exit, where he again stopped. After Wright's vehicle pulled out of his parking space, Benson's vehicle (the light sedan) slowly pulled forward from its parking space, then stopped in front of the taco truck.

At this point the gas station surveillance video malfunctioned, and the initial shooting was not recorded. When the video resumed seconds later, two bright flashes could be seen emanating from the driver's side of a dark sedan that was stopped near the intersection of Anaheim Street and Magnolia Avenue, and then the vehicle made a right turn onto Anaheim Street. The video footage showed people running away from the vehicle and the rear of the taco truck. A detective later recovered a .45-caliber cartridge from where the vehicle was observed.

The police arrested Wright on February 18, 2021 and confiscated his cell phone during the arrest. The same day, the police executed a search warrant on Wright's residence and recovered a .45-caliber gun with a corresponding magazine

7

containing live cartridges from his dining room table. They also recovered a debit card bearing Wright's name and a wallet containing his California identification card from a kitchen countertop. When Wright was arrested, he was wearing gray sweatpants with zipper pockets consistent with the sweatpants seen in the liquor store surveillance video. At the time of Wright's arrest, the police impounded a dark sedan registered to Wright's girlfriend.

Long Beach detectives obtained search warrants for Wright's and Benson's social media accounts. Wright's social media account contained photographs of him wearing a white hooded sweatshirt from the same brand as the one seen in the liquor store surveillance video. The account also contained numerous communications between Wright and Benson.

In October 2020 Benson posted on his social media account a photo of a gun showing its serial number. On December 9, 2020 he posted "Blower[7] for sale," and he included a photograph of a 9-millimeter semiautomatic pistol. Long Beach detectives learned that the Las Vegas police had recovered a firearm that was a potential match (based on a national ballistics database) with the 9-millimeter cartridge cases found at the December 4 crime scene. Long Beach investigators examined the Las Vegas firearm, a 9-millimeter handgun, and determined it matched the ballistic evidence recovered from the taco truck. The gun's serial number also matched the one pictured in Benson's social media advertisement to sell a "blower" and another of his other social media posts.

---

7    A homicide detective testified the term "blower" is a slang term for a gun.

In January 2021 a gold sedan was found after a traffic accident in Long Beach. Police searched the vehicle and recovered multiple 9-millimeter cartridges in a compartment in the driver's side door and a benefits card with Benson's name. Benson also had posted photographs of the vehicle on social media.

Long Beach Police Officer Alexander Roberts testified at trial as the prosecution's gang expert.[8] Officer Roberts explained that the Insane Crips are a Black criminal street gang that claimed territory near the location of the shooting. The Insane Crips were rivals of the East Side Longos, who claimed the territory where the taco truck was located. The Insane Crips used "donkey" and "Chongo" as derogatory terms for Hispanic gang members.

At trial, Officer Roberts pointed out multiple tattoos on Benson's and Wright's bodies that could be seen on photographs displayed to the jury. Officer Roberts opined based on the tattoos that Benson and Wright were members of the Insane Crips. Officer Roberts also testified that Insane Crips members would replace the number "2" with "3" in their speech and writing to avoid lending credence to a rival gang.

Leanna Kim, a criminalist in the Long Beach Forensic Science Services Division, served as the crime lab firearms examiner in the investigation. Kim examined the .45 cartridge case and three bullets found at the crime scene and determined they were fired from the gun recovered at Wright's home. Kim also examined the four 9-millimeter cartridge cases recovered from the taco truck parking lot and determined they were fired

---

[8] No gang crimes or enhancements were charged in the case.

9

from the 9-millimeter firearm recovered in Las Vegas and depicted on Benson's social media posts. In addition, Kim examined the three .380 automatic cartridge cases recovered near the taco truck and concluded they were all fired from one firearm.

3. *Wright's and Benson's* Perkins[9] *statements*

After their arrests, Wright and Benson were each placed in separate jail cells with *Perkins* agents who were posing as inmates. Recorded excerpts of both *Perkins* operations were played at trial.

In one excerpt, Wright expressed frustration that police entered his residence when he was not home and found the .45-caliber handgun. The *Perkins* agent asked, "But it was your burner?"[10] Wright responded, "Uh-huh." In another excerpt, the *Perkins* agent discussed the crime scene's surroundings and told Wright, "So it's cameras all around that motherfucker. What you got to think about, . . . you sure you didn't go . . . to the fucken taco truck that night?" Wright responded, "I did to get food, and I left. That's how they caught me on camera at the liquor store."

The *Perkins* agent suggested "some donkeys" and "Chongos" were at the scene of the shooting. Wright agreed and said, "[W]e was at the taco truck, but we really ordered food. . . . Then the Mexicans showed up." Wright explained that

---

[9] A police operation in which the police obtain statements made by a defendant to an undercover law enforcement agent or paid informant, typically in a jail cell, is referred to as a "*Perkins* operation." (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

[10] There was no testimony at trial explaining the meaning of "burner," but the prosecutor asserted in his opening statement and closing argument that it meant "gun."

"[w]e went to the store," then "we came back and got our food, then came back again," and "we were in two different cars. So I left out the parking [lot]. They were shooting at [inaudible]. So I turned off and got on."

The *Perkins* agent then asked Wright with respect to his companion, "What the fuck was this nigga shooting with?" Wright responded, "He had a Ghost 9 with a muffler on" and added that a Ghost 9 was "a gun that was untraceable." When the agent asked if the shooter got rid of the gun, Wright responded, "I'm positive" and stated the police would not be able to find it.

The *Perkins* agent suggested "basically, the donkeys was about to get off on y'all," and Wright agreed. Wright then gave a detailed narrative of the events that night. He explained that "we" went to get food, and Wright tried interacting with two "Mexican cats" because he was "on the wrong side of the street," but they were rude to him. He added that "[m]y boy" paid for the food, and the taco truck employee told them to return later. They sat in the car smoking, but when "a gang of Chongos [was] walking through the parking lot," Wright said, "'Bro, I'm not about to sit right here just getting food, bro. We gotta go to the store or something.'" Then "we" left for the liquor store to buy something to drink and went to "the house." Wright said he "g[o]t in a different car, because I don't want us to pull back up, and they get to busting on one car. Make it seem like I'm just another car trying to get something to eat." They then returned to the taco truck in separate cars, and Benson "parked in front of the taco truck, and I parked, like, if I could run and get in my car straight and turn out." They got their food, but by then "the Mexicans is walking right through the parking lot. So I walk to

11

my car. They, like, 'What that Longo—like—like, what that Longo [inaudible].' So I'm like, 'Bro, get the fuck out of here with that shit.' I never banged on him. I never said anything. I'm just standing at the back of my car looking out. Then when they walk past my car, I get in the car, and I turn out. I pull up behind the taco truck, and I look. And then I hear shots. When I heard the shots, I turn right on Anaheim [Street]. . . . And I got the fuck up out of there."

The *Perkins* agent asked, "When your boy got off, did he shoot out of your car . . . or his car?" and Wright responded, "his own car." The agent suggested the police would nonetheless try to blame Wright for the shooting because Wright's car drove off during the shooting. Wright responded, "Yeah, that doesn't place me in no homicide though. That just place[s] me where something happened."

Benson told the *Perkins* agent in his jail cell that Benson was from "Insane," and confirmed that "Chongos" and "[d]onkeys" were at the scene of the shooting. The agent then asked, "Was it one motherfucker busting or was it two motherfuckers busting?" Benson responded, "Two."

4. *Benson's Jail Note*

On March 23, 2023 a Los Angeles County sheriff's deputy recovered a note from Benson while he was in jail. The note read, "I need you to book a visit with my crimy so you can tell him to go self defence they got bro[11] video the donkey's not coming 3 court so say he shot cause they was shooting at us." (Capitalization

_____

[11] In his closing argument, the prosecutor argued "bro" meant "broken," but there was no evidence as to the meaning of "bro" as used.

omitted.)  A deputy sheriff from the jail testified that "crimy" was a slang term for somebody jointly charged in a criminal case.

B.      *The Defense Case*
    Forensic scientist Christoper Coleman tested the dark sedan impounded at Wright's residence for gunshot residue about two years after it had been impounded.  Coleman explained that when gunshot residue was "inside a vehicle, if the windows are up, it will stay there forever until it's . . . bothered by the environment or somebody physically wiping it off."  When Coleman examined the sedan, it was in an outdoor impound yard, and its front driver's side window was rolled down two-thirds of the way, which rendered it less valuable for determining whether it contained gunshot residue when it was first impounded.  Coleman's testing found two of the three essential gunshot residue component particles on the car's "headliner or the door or the A-pillar," which "could be associated with gunshot residue, but . . . could be related to . . . impound yards and auto body shops."

    Martin Flores, a non-law enforcement gang expert, testified about characteristics of the East Side Longos and Insane Crips.  A gang member "bang[ing]" on someone" faced a "whole spectrum of possibilities" from "verbal disrespect to a physical altercation to death."  Flores believed Moralez was an East Side Longo member based on her statements in her July 2023 interview with police detectives.

13

C.  *Closing Arguments on Self-defense and Voluntary Manslaughter*

In his closing argument, the prosecutor argued Wright did not act in self-defense because the evidence showed he and Benson had planned to kill the rival gang members by leaving the parking lot and returning in two cars, then positioning their cars to "box them in." Thus, Wright did not reasonably believe he needed to shoot because he was in imminent danger of death or great bodily injury. Further, instead of fleeing from the rival gang members, Wright stopped twice as he left the parking lot: once at the Magnolia Avenue exit and again at the intersection of Magnolia Avenue and Anaheim Street. Benson similarly pulled his car out slowly and stopped for a few seconds prior to the shooting.

The prosecutor also argued that Benson's jail note showed "they (Wright and Benson) are trying to work together in order to set up a defense of self-defense." In addition, the note constituted an admission that Benson and Wright did not act in self-defense, and they instead planned "to get these people into a crossfire, shoot, and kill them."

The prosecutor argued with respect to voluntary manslaughter that Wright had not been provoked (and thus did not act out of heat of passion) because he was "already well on his way out of the parking lot at the time" of the shooting. Further, Wright initiated the confrontation by "banging" on the Hispanic gang members and then planning to kill them. Wright could not rely on a theory of imperfect self-defense because there was no evidence that Wright actually believed one of the rival gang members was threatening to kill him or pointing a weapon at him or Benson.

Wright's counsel posited that there were at least four shooters at the scene. He acknowledged that Benson shot from his car on the northeast side of the parking lot. In addition, he argued, there was an unknown shooter on the south side of the parking lot on Anaheim Street, noting Soto's testimony and the video showing a few people running back to the area near Anaheim after the shooting and "lean[ing] down as though they were picking something up." Wright's attorney argued the people could have been running back to recover a gun. Wright's attorney asserted there was a third shooter who fired from near the taco truck's bumper, as shown by Minuez's testimony (that she heard gunshots coming from behind the taco truck) and the .380 cartridge cases found at that location, and it was reasonable to conclude this person fired at the shooter on Magnolia Avenue. Wright's attorney urged the jury to reject the prosecutor's argument that Wright was the shooter on Magnolia Avenue, but in any event, that shooter fired in response to the second and third shooters and potentially in defense of Benson.

With respect to Benson's jail note, Wright's attorney argued the note was written over two years after the shooting, Benson may have written it to exonerate himself, and Benson did not know the timing or location of all the shooters at the scene.

In rebuttal, the prosecutor noted that neither Wright nor Benson ever stated a need to defend themselves during the *Perkins* operations. Rather, Wright described only how the rival groups had exchanged words.

D.    *The Jury Instructions, Verdict, and Sentencing*

As relevant here, the trial court instructed the jury with CALCRIM No. 505 on justifiable homicide based on self-defense.

15

The court also instructed the jury on voluntary manslaughter with CALCRIM Nos. 570 and 571 regarding heat of passion and imperfect self-defense, respectively, and corresponding instructions were provided for the attempted murder count.

The jury found Wright guilty of the first degree murder of Martinez (Pen. Code, § 187, subd. (a); count 1);[12] the attempted willful, deliberate, and premeditated murder of Moralez (§§ 187, subd. (a), 664; count 2); assault with a semiautomatic firearm (§ 245, subd. (b); count 3); and discharging a firearm from a vehicle (§ 26100, subd. (c); count 4). The jury also found true with respect to each count that Wright personally used a firearm in the commission of the offenses (§ 12022.5, subd. (a)).

The trial court sentenced Wright to an aggregate state prison sentence of 28 years to life. The court imposed on count 1 a term of 25 years to life, plus the lower term of three years for the firearm-use enhancement. On count 2 for attempted murder the court imposed a life term, plus three years for the firearm-use enhancement, to run concurrent to count 1. The court imposed and stayed under section 654 a sentence of six years (the middle term) on count 3 for assault with a semiautomatic firearm and five years (the middle term) on count 4 for discharging a firearm from a vehicle.

Wright timely appealed.

---

[12] Further undesignated statutory references are to the Penal Code.

16

# DISCUSSION

A. *The Challenged Evidentiary Ruling*

Prior to trial Wright's attorney filed a motion in limine to exclude Benson's jail note that, as discussed, directed a visitor to meet with Benson's "crimy" to "tell him to go self defence" and "say he shot cause they was shooting at us." Wright argued the note contained hearsay and was irrelevant and prejudicial.[13] Wright's attorney argued the note was not probative of Wright's state of mind, motive, or attempt to fabricate a defense because Benson wrote the note years after the shooting and there was no evidence that Wright received the note. At the hearing on the motion, the prosecutor argued the note was relevant because it showed Benson "attempting to pass on information to Mr. Wright in order to set up a joint defense of self-defense at trial." The court denied Wright's motion, finding the note was relevant and not unduly prejudicial.

Defense counsel renewed his objection to the note before opening statements. The prosecutor again asserted the note showed Benson's "consciousness of guilt" and his "attempt to manufacture evidence with his . . . co-defendant in this case."

---

[13] On appeal, Wright concedes the statement in Benson's note was not hearsay because it was not admitted for the truth of the matter asserted. Accordingly, we do not reach whether the note was properly admitted against Wright under *People v. Greenberger* (1997) 58 Cal.App.4th 298 (which the prosecutor had argued in the trial court). Under *Greenberger*, a defendant's hearsay statement implicating a codefendant may be admitted in a joint trial without violating the codefendant's right of confrontation under the United States Constitution if it qualifies as a declaration against penal interest. (*Id.* at pp. 330-331.)

17

The trial court stated its "prior ruling stands" and overruled the objection.

B.    *Even if the Trial Court Abused Its Discretion in Admitting Benson's Note, Any Error Was Harmless*

1.    *Governing law and standard of review*

"'No evidence is admissible except relevant evidence.' (Evid. Code, § 350.)  'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.)  "'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Hardy*, at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.)

"'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.'  The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 363 ["'"Evidence is not prejudicial, as that term is used in a section 352 context, merely

18

because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of *undue* prejudice.'"'].)

We review a trial court's ruling on evidentiary issues, including objections based on relevance and prejudice, for abuse of discretion.  (*People v. Hardy, supra*, 5 Cal.5th at p. 87 ["'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value.  Its rulings will not be overturned on appeal absent an abuse of that discretion.'"]; see *People v. Bell, supra*, 7 Cal.5th at p. 105.)

Even if a trial court improperly admits or excludes evidence in violation of state statutory law, we will not reverse the judgment unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Thomas, supra*, 14 Cal.5th at pp. 373-374 [applying *Watson* standard to alleged error under Evid. Code, § 352]; *People v. Gomez* (2018) 6 Cal.5th 243, 291 [applying *Watson* standard to trial court's erroneous instruction to jury that it could consider defendant's brief absence from trial to prove consciousness of guilt].)

2.    *Any error in admitting the jail note was harmless*

Wright contends the trial court abused its discretion in admitting Benson's jail note because it was not probative of Wright's consciousness of guilt or state of mind given the lack of evidence Wright received it, and further, any relevance was outweighed by the prejudice to Wright from an inference that he was conspiring with Benson to fabricate a self-defense argument.

19

The Attorney General contends the jail note was relevant because it supported an inference that Wright did not shoot in self-defense.

We agree with Wright that admission of the jail note to show Benson and Wright were working together to create a false narrative of self-defense was prejudicial because there was no evidence that Wright was communicating with Benson when the jail note was written, and Wright never received the note (which was confiscated at the jail). Absent any other evidence of post-shooting collusion between Wright and Benson, the jail note had minimal probative value to prove Wright and Benson were working together on a defense. Moreover, the prosecutor repeatedly argued to the jury that Wright and Benson were working together to "set up a defense of self-defense," asserting this once during his opening statement, twice during his closing argument, and again during his argument to the jury in response to a jury note.[14] (See *People v. Garcia* (2024) 107 Cal.App.5th 1040, 1059 ["The prejudice created by the nonprobative . . . evidence was undoubtedly intensified by how the prosecutor used the evidence in closing argument."].)

---

[14] During deliberations the jury requested the trial court clarify for what purpose it could consider the evidence of "gang activity." The trial court allowed counsel to present argument on the question. The prosecutor argued that evidence of gang activity could not be used to show Wright acted in self-defense because there was "zero evidence that . . . [Wright] actually believes in the need of self-defense. . . . In fact, the only evidence related to self-defense comes in the note that his co-defendant Tyquan Benson attempted to pass on to him, which was they're going to set up a fake self-defense."

20

However, as the Attorney General argues on appeal, the jail note had some probative value for a different purpose—to support an inference that had the video recording of the incident not stopped at the critical moment, the video would have shown that Wright did not act in self-defense.[15]  Otherwise, Benson would have had no reason to write a note to Wright encouraging him to claim self-defense in light of the missing footage and the fact the rival gang members were not coming to court to testify.  Thus, the note showed Wright's confederate believed Wright did not act in self-defense but could still claim self-defense based on the broken video.  The prosecutor made this argument in his closing, explaining that by pointing out the video was broken and the rival gang members were not going to testify, Benson was "in the process admitting that self-defense doesn't apply."  The prosecutor added that in the jail note "Benson is admitting what we all know," that "this was a plan by Tyquan Benson and Jacquise Wright to get these people into a crossfire, shoot, and kill them."

Even if the trial court abused its discretion in admitting the jail note for all purposes, including to show a plan to fabricate a self-defense argument, any error was harmless.  We do not find persuasive Wright's argument that absent the jail note it is reasonably probable the jury would have found he acted in self-defense or heat of passion.

---

[15]  The prosecutor did not make this relevance argument in response to Wright's motion in limine, but we need not reach the import of the prosecutor's failure to raise the argument below because we conclude any error in admitting the jail note was harmless.

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; accord, *People v. Horn* (2021) 63 Cal.App.5th 672, 682.) "Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm." (*Humphrey*, at p. 1082.)

With respect to a heat of passion defense for voluntary manslaughter, "'The defendant must actually, subjectively, kill under the heat of passion.' [Citation.] With respect to the objective component, "'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.'" [Citation.] . . . The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim or by conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Choyce* (2025) 18 Cal.5th 86, 104-105; accord, *People v. Enraca* (2012) 53 Cal.4th 735, 759.) The People have the burden of proving beyond a reasonable doubt that the circumstances supporting self-defense, imperfect self-defense, or heat of passion are lacking. (*People v. Rios* (2000) 23 Cal.4th 450, 462; see CALCRIM No. 505.)

There was compelling evidence that Wright and Benson planned and coordinated the taco truck shooting at the rival Longos gang members. The prosecution's gang expert identified Wright and Benson as members of the Insane Crips, which was a rival of the East Side Longos gang. The Hispanic individuals at

the taco truck were members of or associated with the Longos gang, and during the encounter, Wright or Benson yelled "Fuck Chongos," a disrespectful reference to the Longos gang.

Multiple witnesses confirmed the series of events leading up to the shooting, with minor inconsistencies. Wright and Benson arrived in Wright's dark sedan, parked, and ordered food from the taco truck. At that time there was a group of Hispanic men and women standing around the food truck. After ordering their food, Wright and Benson left in Wright's car and returned in two cars because, as Wright later told the *Perkins* agent, "a gang of Chongos [was] walking through the parking lot."

When Wright and Benson returned, one of them picked up the food, and gang challenges followed, with Wright or Benson asking members of the Hispanic group, "Where are you from?" Video footage showed Wright and Benson then getting into their cars and driving away in a coordinated fashion. Wright drove in his dark sedan toward the Magnolia Street exit, stopped, and shot from the rear of the taco truck (near where the .45-caliber cartridge case was found). Benson pulled out of his parking space after Wright and slowly drove toward the northeast side of the parking lot, stopped, then fired from in front of the taco truck (where the 9-millimeter cartridge cases were found).

Wright's self-defense theories depended on the jury finding he shot toward the taco truck based on his actual belief he needed to defend himself from imminent harm. (*People v. Humphrey, supra*, 13 Cal.4th at p. 1082.) But the jury could only find one of the self-defense theories applied if it rejected the compelling evidence that Wright and Benson coordinated and executed a plan to return to the taco truck in separate cars and to shoot at the rival gang members from two sides of the taco truck.

23

Moreover, following their confrontation with the Hispanic group, Wright and Benson did not act as if they feared imminent harm, and instead calmly walked away, entered their separate cars, began to drive away, and then slowed or stopped their cars. (See *In re Christian S.* (1994) 7 Cal.4th 768, 783 ["""[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*"""]; *People v. Odell* (2023) 92 Cal.App.5th 307, 310, 321 [refusing self-defense instruction where defendant escalated conflict after verbal confrontation had subsided].)

The same evidence showing a coordinated plan to shoot at the Hispanic group defeats a claim that Wright acted in the heat of passion based on provocation from the rival gang members. (See *People v. Choyce, supra*, 18 Cal.5th at p. 105 ["where evidence suggests manner of killing was 'conceived in advance' it suggests a 'deliberate plan' and not a 'rash explosion of violence'" that would support a heat of passion theory].) And even assuming the Hispanic group initiated the gang challenges, this would not alone constitute provocation for purposes of a heat of passion defense. (See *People v. Enraca, supra*, 53 Cal.4th at p. 759 ["we have rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter"].)

Finally, Wright provided a detailed account of the shooting to the *Perkins* agent, confirmed Benson's gun was untraceable, and admitted the .45-caliber gun used at the shooting was his, but at no time did Wright state he believed he was being shot at or feared for his or Benson's life. Although Wright's attorney argued in his closing that someone shot at Wright from near the

taco truck, there was no evidence of a second or third shooter. Wright's attorney based his argument there was a second shooter on speculation that a few people ran back toward Anaheim Street (to the south) and appeared to pick up something like a gun, but there was no evidence a gun was ever left there (or used) by a second shooter. As to the hypothetical third shooter, Wright's attorney based this argument on the fact .380 cartridge cases were found near the rear of the truck near Magnolia Avenue, but the cases were never linked to a specific person (nor was Wright excluded as having fired those shots). In addition, multiple witnesses testified that the Hispanic individuals did not have any weapons on the night of the shooting.

Given the lack of any evidence of self-defense or heat of passion, it is not reasonably probable that had the jail note been excluded, the jury would have found one of these defenses applied.[16]

---

[16] For the same reasons we reject Wright's argument that admission of the jail note rendered the trial fundamentally unfair in violation of Wright's right to due process. (See *People v. Partida* (2005) 37 Cal.4th 428, 436 ["[T]he admission of evidence, even if error under state law, violates due process only if it makes the trial fundamentally unfair."]; *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025-1026 ["For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'""].)

## DISPOSITION

The judgment is affirmed.


                                              FEUER, J.

We concur:



MARTINEZ, P. J.



STONE, J.